# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### AUGUST SESSION, 1998

FILED

January 28, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9710-CC-00503 |
| | ) | |
| Appellee, | ) | |
| | ) | LINCOLN COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. CHARLES LEE, JUDGE |
| JOAN ELIZABETH HALL, | ) | |
| | ) | |
| Appellant. | ) | (FIRST DEGREE MURDER) |

FOR THE APPELLANT:                    FOR THE APPELLEE:

RAYMOND W. FRALEY, JR.                JOHN KNOX WALKUP
Attorney at Law                      Attorney General & Reporter

JOHNNY D. HILL, JR.                  TIMOTHY BEHAN
Attorney at Law                      Assistant Attorney General
205 East Market Street               2nd Floor, Cordell Hull Building
P.O. Box 572                         425 Fifth Avenue North
Fayetteville, TN  37334              Nashville, TN  37243

RICHARD McGEE                        W. MICHAEL McCOWN
Attorney at Law                      District Attorney General
601 Woodland Street
Nashville, TN  37206                 WEAKLEY E. BARNARD
                                     Assistant District Attorney General
                                     P.O. Box 904
                                     Fayetteville, TN  37334

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Joan E. Hall, appeals as of right following her conviction in the Lincoln County Circuit Court. Following a jury trial, she was convicted of criminal responsibility for the conduct of another committing first degree murder and was subsequently sentenced to life imprisonment. In this appeal, Defendant raises the following issues:

> 1) Whether the State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), such that Defendant's due process rights were violated warranting a new trial;
>
> 2) Whether the trial court erred in failing to grant a new trial due to the perjured testimony of Natalie Romine; and
>
> 3) Whether, in light of the Brady violations and the perjured testimony of Natalie Romine, sufficient evidence exists to convict the Defendant.

We affirm the judgment of the trial court.

Stan Golden testified that he was traveling, on August 1, 1995, across Eldad Bridge at approximately 4:08 p.m. when he was flagged down by the Defendant. The Defendant told him that "they had shot her husband," and her husband was now laying in the river dead.

Danetta Marshall lived in the vicinity of the Eldad Bridge and was alerted by her next door neighbor, on August 1, 1995, that someone had been shot. When Marshall came outside, the Defendant was crawling up her driveway and eventually sat next to Marshall's car. Defendant screamed, "[T]hey shot my husband. They're going to kill me." Marshall's next door neighbor, Michael Key, then went inside Marshall's home to call 911.

Michael Key lived next door to Danetta Marshall. Key left work on August 1, 1995, at 3:30 p.m. and arrived home fifteen (15) to twenty (20) minutes later. While feeding his dogs, Key heard someone screaming for help, and he estimated the time he first heard the screams to be between 4:00 and 4:30 p.m.

Adrian Key, Michael's Key's son, was alerted by his brother of the situation. Adrian Key walked outside and found the Defendant screaming, "Don't let them get me. They shot my husband." Aron Key, Michael Key's older son, also observed the Defendant screaming between 4:00 and 4:30 p.m. that "they" killed her husband and were going to kill her.

Chad Robinson, the eighteen (18) year old stepson of Michael Key, drove to his home on the afternoon of August 1, 1995. When he got out of his car and started walking toward the house, he heard a gunshot. He went inside for five (5) or ten (10) minutes, then left again to go to an auto parts store nearby. Robinson spent ten (10) minutes driving to the store and approximately six (6) minutes inside the store, then returned home to find his brother and father sitting with the Defendant on the side of the road. Robinson estimated that the time between hearing the gunshot until he saw the Defendant to have been about twenty (20) or twenty-five (25) minutes. Robinson also recalled that Defendant used the word "they" when describing who had shot her husband.

Johnny Simmons, a deputy with the Lincoln County Sheriff's Department, received a call at 4:18 p.m. on August 1, 1995. Simmons went to the scene at Eldad Bridge, arriving at 5:10 p.m. as one of the first officers on the scene. Simmons observed the victim's body lying next to the river bank.

Andy Cline, the head of Crime Stoppers in Lincoln County, traveled to Eldad Road to videotape the crime scene on August 1, 1995. His video of the crime scene was shown to the jury.

Mac Kidd, paramedic with the Lincoln County Regional EMS, responded to a call at the Eldad River Bridge on August 1, 1995. The body of the victim had already been pulled from the river when he arrived on the scene. Kidd noted that the victim had a gunshot wound to the back of his head without an exit wound, blood coming from his left ear, and a possible entrance wound to the upper left quadrant of his body with a possible exit point in the lower right side of his abdomen. The body was transported to Lincoln Regional Hospital.

Mamie Ruth Hall, mother of the victim, testified that her son had two adopted daughters, one biological daughter and twin sons. He had been married to the Defendant for seven years on July 31, 1995. While the victim had been employed at Amana Refrigeration, he was laid off in July 1995. The Defendant's two daughters lived with the victim and the Defendant, and following the death of the Defendant's mother, the Defendant's biological son, Richard Romine, also came to live with them. A year prior to the victim's death, Richard Romine left to live with Michael Romine in Ohio. Mamie Hall explained that Michael Romine was the Defendant's older brother, and Richard was the Defendant's biological son who had been adopted by the Defendant's parents.

Mamie Hall stated that her relationship with the victim and the Defendant was good and they saw each other often. She described an incident during which the Defendant had threatened to kill her son, although she perceived that to be said "in

-4-

jest." Hall often went fishing with the Defendant and the victim, and she had fished at the same spot where the shooting occurred just four (4) days prior to the shooting incident.

Following the victim's death and funeral, the Defendant told Hall that she did not know what happened. However, on the evening of the shooting, Hall overheard the Defendant tell her daughter that Richard Romine had shot the victim. Because she was suspicious, Hall hired Larry Shavers to independently investigate the murder. Their first meeting was on October 21, 1995.

Joyce McConnell, Investigator for the Lincoln County Sheriff's Department, answered a 911 call at 4:15 p.m. on August 1, 1995 by traveling to the Eldad River Bridge on Eldad Road. After she arrived, McConnell was directed to Danetta Marshall's home where she found the Defendant sitting on the front porch. McConnell described the Defendant as hysterical, crying and scared. Defendant stated that "they" were going to get her, indicating that while she did not witness her husband's shooting, she believed more than one (1) person was involved as she overheard someone say, "[T]here she goes," when she attempted to flee the area. Defendant had left the spot where she and the victim were fishing to use the bathroom, and while she was finishing she heard her husband yell, "Run Joanie." While Defendant did not mention Richard Romine's presence at the time, she later told McConnell he had been with them while they were fishing, but she did not know where he was at the time of the shooting.

Defendant was advised to come by the Sheriff's Department. When she did, her Miranda rights were administered to her and a statement was taken. This

statement was recorded and the tape was played to the jury. McConnell described that during the interview Defendant did not know who shot her husband. After leaving the area where they were fishing to go to the bathroom, she heard her husband yell, "Run Joanie," and then she heard shots. Defendant indicated that Richard Romine had been with them earlier, but they dropped him off at the intersection of Eldad Road and Liberty Road. In Defendant's handwritten supplement to her statement to police given on August 1, 1995, the Defendant included the following: "[A]nother time, Richard told my daughter that he would kill Olen by shooting him. I asked him how he would get away with it. He told me that he would blame it on me saying that I had him do it." Other investigation in which McConnell was involved included a search of the Defendant and the victim's home for weapons, but none of those found were determined to be the weapon used for the shooting. The Defendant was tested for gunshot residue, but the result was not positive.

McConnell stated that Richard Romine was charged with the murder of the victim on the evening of August 1, 1995. The investigation continued until February or March 1996. The Defendant and David Michael Romine were subsequently charged.

Kevin Duff, life insurance claims examiner for Principal Financial Group, testified that the Defendant was paid $84,692.38 in death benefits for a life insurance policy the victim had in effect at the time of his death.

Mike Hunter, investigator with the Lewisburg Police, also interviewed the Defendant who stated that she, Richard Romine and the victim had gone fishing.

After she left the fishing scene to go to the bathroom, she heard her husband yell, "Run Joanie," and then heard one (1) or two (2) shots. After running back to find her husband, she saw him lying facedown in the water. The Defendant described that the victim and Richard Romine had problems, with Richard threatening to kill the victim if given the chance. Richard had left their home to live with his brother Michael Romine in Ohio, but he returned to Tennessee in March 1995. Michael Romine eventually moved to the area, then Richard and Michael moved in together about one-half mile from the victim and the Defendant's home.

Richard Romine testified that although he was seventeen (17) years old at the time of trial, he was sixteen (16) on August 1, 1995. He learned at the age of twelve (12) that Defendant was his biological mother, though he had always known her as his adopted sister while he resided with his adopted mother and grandmother in North Carolina. After his adopted mother died, Richard went to live with the Defendant and the victim. Defendant's two daughters, Jenia and Mary Jane Latiolais, were also living there.

Initially, Richard admitted his first problems with the victim were when he found a mark on Jania's left leg after the victim had hit her with a belt. Also, there was a dispute over the television during which law enforcement officers came to the home and advised Richard to spend the night away from the Hall residence. Shortly after this incident Richard moved to Ohio to live with Michael Romine. After Richard and Michael moved back to Lincoln County, the Defendant found a mobile home for them to live in. Richard and the victim fished on a weekly basis, although never at the scene of the shooting.

Richard admitted that about two (2) or three (3) weeks prior to the murder, the Defendant discussed the problems she was having with the victim. She told Richard she wanted him to kill the victim because that was the only way to get rid of all the problems. Richard did not take her seriously until she produced a Derringer two-shot handgun. Defendant showed Richard how to operate the gun and then placed it back inside her purse. Four (4) or five (5) days later, the Defendant told him that if he were going to kill the victim, then it would have to be done prior to August 1, 1995, because the victim's insurance was running out on that date. A third conversation regarding killing the victim occurred a few days later, and it was then that Richard told the Defendant he would commit the murder.

Two (2) or three (3) days prior to August 1, 1995, Richard again talked with the Defendant while Michael Romine was present. The Defendant then offered to give him the victim's truck, $10,000.00, and to pay his health insurance in return for his killing her husband. The plan was for Richard to shoot the Defendant in the leg while they were fishing so that it would appear to be a robbery. The Defendant then advised Richard that because the victim's employer had paid to renew his insurance policies and the policies would not lapse, there was no hurry to commit the murder prior to August 1, 1995. The day prior to the shooting, the plans changed slightly such that Richard was not supposed to be present at the time of the shooting, nor was he supposed to shoot the Defendant in the leg to make it look like a robbery. Michael Romine showed Richard how to load the handgun using real bullets, then the Defendant gave him four (4) hollow point bullets. Two (2) bullets were placed in the gun, with the remaining two left in Richard's pocket.

After their meeting, Richard began writing a contract for the Defendant to sign. He messed up the first version and threw it away in a shoe box. The second contract provided that Richard was "supposed to off Olen [victim]" with the Defendant to supply the gun, gloves, and alibi. Also, the Defendant was to give Richard $10,000.00, the victim's truck and pay his health insurance for two (2) years. He met the Defendant later that same day, but she refused to sign the contract. Richard stated that Defendant did agree with its contents. He also put this contract into the shoe box. A plan was made for Michael to pick him up after the shooting.

On August 1, 1995, after 2:30 p.m., the Defendant picked up Richard and he got the gun, gloves, and fishing gear. Richard put the gun in his pocket. When they went to the Defendant's residence, the victim was "being quiet." Richard told Defendant that the victim knew about their plan, but Defendant denied this. Richard claimed that the plan was for him to shoot the victim on the path leading to the river, but he could not get his gloves on so he went to the opposite side of the bridge from the victim. Defendant stated she had to go to the bathroom, and then Richard approached the victim from behind and shot him. After the victim fell into the water, Defendant came up behind him and was pointing at the victim so he shot him in the head. The gun was thrown into the river, and he fled the scene to be picked up by Michael.

Richard and Michael drove to Bi-Lo Supermarket to pay their telephone bill, and Richard told Michael that, "[H]e was shot. He was dead." After paying the phone bill, they drove to the Defendant's residence where Richard placed his gloves and his shoes in a barrel used for burning trash. Richard washed off and changed clothes, leaving his clothes in the laundry. They traveled towards Pulaski, then

returned to the Defendant's home to get her daughters. When they arrived, they "found out" about the victim's shooting so they went to the hospital. After leaving the hospital and going to Ruth Hall's home, law enforcement officers arrived and took Richard into custody.

On cross-examination, Richard admitted some inconsistencies in his testimony and confessions, including that he initially claimed his confession was not a true story. He recalled telling workers at the Middle Tennessee Mental Health Institute that he was "messed up in the head" and that you "have to be a little crazy to do what I did - commit murder." He also told investigators that Defendant had pulled the trigger, but admitted at trial that was a lie. Richard identified a letter which he wrote to the Defendant dated April 26, 1996, in which he indicated he "did wrong" and should have taken responsibility for his acts and never should have tried to "put it off on her."

Donna Pence, special agent with the TBI, was called in to investigate with McConnell in October 1995. She received some torn pieces of paper and a mug from Larry Shavers. Pence first interviewed Michael Romine on January 19, 1996, and she also participated in the interview of Natalie Romine on February 1, 1996. Notes were made from both these interviews , and the Defendant received copies of the notes from Michael Romine's interview.

Michael Romine testified that he is the biological uncle and adopted brother of Richard Romine. During the summer of 1994, Defendant contacted Michael to ask if Richard could come to live with him because Richard and the victim were having problems. Michael agreed, but in February 1995 he sent Richard back to

Tennessee. Two (2) weeks later, Michael moved to Tennessee and he and Richard eventually moved into a trailer. The relationship between Defendant and her husband was tense to the point that during the summer of 1995, the Defendant told him that the victim needed to go. She described a plan she had devised for him to be shot while they were on a fishing trip.

Two (2) days later, the Defendant showed a .38 caliber weapon to Michael and offered him $10,000.00 and a truck. The shooting was supposed to occur that same day. Michael came to the river where the Defendant and the victim were fishing, but he was unable to pull the gun out. Afterwards, the Defendant said she was only "playing around" with Michael and knew he would not shoot her husband, but then stated that she was in the process of poisoning her husband by putting poison in the honey he used in his coffee. Michael recalled seeing the Defendant mix something in the honey she added to Defendant's coffee. A week prior to August 1, 1995, the Defendant mentioned a double indemnity aspect of the insurance and asked Richard to shoot the victim. Three (3) or four (4) days later, the Defendant, Michael and Richard were again discussing shooting the victim. The Defendant told Richard that if he were caught he would only serve six (6) months incarceration in a juvenile facility and that she would provide his lawyer and an alibi. The plan was devised for Richard to shoot the victim, with Michael then picking up Richard, and the Defendant claiming that three (3) men tried to rob them.

On the evening prior to August 1, 1995, the Defendant stated that the shooting was to occur the next day. On the morning of August 1, 1995, the Defendant gave Michael $300.00 to pay his phone bill in order to provide an alibi for Richard. The Defendant picked up Richard at 2:45 p.m., then Michael went to her home at 3:00

p.m. to start a load of laundry. Michael then drove to Eldad Bridge, and when he arrived he saw Richard running towards the highway. Richard got into the back of Michael's vehicle, and they drove to Bi-Lo Supermarket to pay Michael's phone bill. The bill reflected it was paid at 3:43 p.m. on August 1, 1995. Then they drove back to the Defendant's residence where Richard took a shower while Michael started a fire in the trash barrel to burn Richard's shoes. Michael put Richard's clothes in the washing machine. Michael later found two (2) bullets in the washing machine which he threw in a woodshed, but he later retrieved the bullets and turned them over to personnel in the public defender's office.

In his initial statements to law enforcement officers, Michael admitted that he did not tell the "whole truth" in an effort to assist his brother Richard. He identified a contract found by Natalie Romine in Richard's room after the victim's funeral. It was placed behind a picture in Richard's room. He saw it again while he was in North Carolina when Natalie gave it to him torn into pieces. Following the indictment against him for criminal responsibility and accessory after the fact, he pled guilty to being an accessory with an agreement to serve a two (2) year sentence.

Louis Kuykendall, special agent forensic toxicologist with the TBI, testified that he tested the victim's coffee cup for Diazinon or Dursban, commonly known as insecticides. He found a brown residue on the cup. While the tests showed no basic or acidic drugs, it did test positively for cyanide in the residue.

Natalie Romine is married to James Frederick Romine, the Defendant's brother, and she had only met the Defendant on two (2) or three (3) occasions prior to the victim's death. After learning of the victim's death, she called the Defendant

and was told that Richard had killed him. The Defendant asked Natalie to come for the funeral because she had no other family. Natalie agreed and flew to Huntsville, Alabama where she was picked up by the Defendant and her daughters. After arriving, the Defendant appeared to be "fine," but told Natalie that if it would have happened any later, she would not have received any insurance money. The Defendant advised Natalie that she would receive $250,000.00 from the victim's death. Defendant described the victim as the "meanest son of a bitch that ever lived." Defendant claimed that she was trying to protect Richard. After returning to the Defendant's home, the Defendant called the insurance company.

At the visitation prior to the victim's funeral, the Defendant gave various accounts of how her husband's shooting occurred, including that Richard had been smoking marijuana prior to killing the victim. Following the funeral, Defendant joked all the way to the cemetery, but adjusted her rearview mirror to prevent people in the car following them from seeing her amusement. After they returned to the funeral home, Defendant gave Natalie and Michael money so that they could get food and beer.

That same evening, Natalie found the contract at Michael and Richard's home. She stated that the document read, "I want . . . $10,000.00, Olen's truck, two years' insurance. You supply me with weapon, alibi and gloves." While reading the document, Michael took it from Natalie and stuck it into his boot. Michael later returned it to her to read. The following day, they went to visit Richard who was being detained at the juvenile detention center. Richard tried to tell Natalie what had happened, but the Defendant warned him not to do so. That evening they all went drinking, and Natalie returned to North Carolina the following day.

Michael came to visit Natalie on two (2) or three (3) different occasions in North Carolina, and the Defendant moved there to live in a trailer on her brother's land. While Michael was there, Natalie overheard him tell the Defendant that she had better get a lawyer for Richard. Later, she heard Michael talking about how the Defendant tried to poison her husband, and the Defendant then implied to Natalie that "[i]t should have worked," in reference to her attempts to poison the victim. On another occasion, the Defendant admitted that she asked Michael to kill her husband.

While not present when the contract was torn into pieces, Natalie saw the contract on her kitchen table after it was torn into pieces by the Defendant. Natalie placed the pieces of the contract into an envelope which she placed in her bedroom, then later gave to Michael. Natalie recalled other conversations she had with the Defendant during which the Defendant advised her that she had Richard kill the victim.

Charles Harlan, forensic pathologist and medical examiner, performed the autopsy of the victim. The death was determined to have been caused by two (2) gunshot wounds to the head, chest and abdomen, with both shots being fatal. The first gunshot wound was a near gunshot wound to the back, with the muzzle of the gun being from six (6) to twelve (12) inches from the victim's body. The victim bled for somewhere between three (3) to ten (10) minutes from this wound. The gunshot to the victim's head caused him to cease being a viable organism immediately upon being shot, even though it would have taken several minutes for him to have died. Upon testing the victim's blood and urine, no basic drugs were detected. Harlan testified that "the cyanide test was not tested for by the laboratory." However,

without further explanation, Harlan stated that there was no indication of the presence of cyanide during the autopsy because "if cyanide is present, I can detect it."

This evidence concluded the State's case-in-chief.

Jeff Bradford, investigator with the Lincoln County Sheriff's Department, testified that he participated in the investigation at the scene of the shooting and then later questioned the Defendant at the Sheriff's Department. He, along with the Defendant and Investigator Mike Hopson, went to the residence of Michael and Richard Romine where they searched the home. They found a shoe box in the bedroom containing drug paraphernalia, but no contract was found.

Jim Cranford, the brother of Ruth Hall, observed that the Defendant and the victim had an excellent marriage. During the funeral, he never observed any inappropriate behavior by the Defendant, and thought she appeared to truly mourn the death of her husband.

Palmeda Taylor, a licensed psychologist, evaluated Richard Romine and concluded that he was not mentally ill and was competent to stand trial. Richard admitted to her that, "You have to be a little crazy to do what I did, that is, commit murder." Two (2) weeks later, Richard retracted his confession of killing the victim and named the Defendant as the murderer. She described his behavior as generally manipulative and superficially cooperative, having average intelligence and knowing right from wrong. Richard admitted to a poor frustration tolerance and poor anger control, stating that he "could not stand too many people. If I don't like them, I want

to hit them." Dr. Taylor found Richard as having the potential for reacting with overt anger when he was upset.

This concluded the proof by the Defendant.

EXCULPATORY EVIDENCE

In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the prosecution has a constitutional duty to furnish the accused with exculpatory evidence pertaining to either the accused's guilt or innocence and the punishment that may be imposed. Failure to reveal exculpatory evidence violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution. Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97. Also, evidence which may be used by the defense to impeach a witness must be disclosed by the prosecution. See Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); Workman v. State, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 555 (1994); State v. Davis, 823 S.W.2d 217, 218 (Tenn. Crim. App. 1991). In determining whether a due process violation has occurred, the following four (4) prerequisites must be satisfied:

1) The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not);

-16-

2) The state must have suppressed the information;

3) The information must have been favorable to the accused; and

4) The information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn.), amended on reh'g (Tenn. 1995) (citations omitted).

Defendant has the burden of proving a constitutional violation by a preponderance of the evidence. Id. at 389 (*citing* State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)). Proving this constitutional violation is centered upon whether the omission's significance rises to the level of denying the Defendant a fair trial. Edgin, 902 S.W.2d at 389 (*citing* United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976)). The standard by which the materiality of undisclosed information is measured was pronounced in Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995), which held that, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Thus, to prove a Brady violation, the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." Id. Or, as succinctly stated in the majority opinion of a panel of this court in State v. Jeffrey R. Allen and Jennings Michael Coen, C.C.A. No. 03C01-9708-CC-00367, slip op. at 7, Anderson County (Tenn. Crim. App., Knoxville, Jan. 8, 1999) (citations omitted), "[e]vidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different."

-17-

Defendant argues that the State withheld exculpatory evidence in violation of Brady and its progeny. Basically, Defendant has categorized the exculpatory evidence as follows:

I. The written witness statements of Danetta Marshall, Aron Key, Adrian Key, Michael Key, and Chad Robinson;

II. A written statement of Natalie Romine, which was a sixty-nine (69) page sworn statement given by Natalie Romine to Larry Shavers, an independent investigator; and

III. A TBI report by Special Agent Donna Pence.

Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, Brady normally does not apply, unless the delay itself causes prejudice. Sylvester Smith v. State, C.C.A. No. 02C01-9801-CR-00018, slip op. at 13, Shelby County (Tenn. Crim. App., Jackson, Dec. 28, 1998); State v. Sydney M. Ewing, C.C.A. No. 01C01-9612-CR-00531, Davidson County, (Tenn. Crim. App., Nashville, June 19, 1998), vacated and re-entered, (Tenn. Crim. App., Nashville, Aug. 18, 1998); State v. Jim Inman, C.C.A. No. 03C01-9201-CR-00020 (Tenn. Crim. App., Knoxville, Nov. 23, 1993) perm. to appeal denied, (Tenn., April 14, 1994).

We note that while the Defendant expended a considerable portion of her brief and reply brief to the issues regarding exculpatory evidence, in many instances, citations to the record in support of the argument are lacking. On the other hand, the State does not complain about the lack of citation to the record by Defendant. The State has devoted a minimal portion of its argument to this issue. Its brief basically cites the law applicable to exculpatory evidence and takes the conclusory position that all of the statements are merely Jencks material required to be produced pursuant to the provisions of Rule 26.2 of the Tennessee Rules of Criminal

Procedure. In this particular case, we will therefore examine Defendant's issues as best as we can under the circumstances.

## I. THE WRITTEN WITNESS STATEMENTS OF DANETTA MARSHALL, ARON KEY, ADRIAN KEY, MICHAEL KEY, AND CHAD ROBINSON

The written statements of Danetta Marshall, Aron Key, Adrian Key, Michael Key, and Chad Robinson are not part of the record in this appeal, and there apparently was no effort to preserve them for the record as they are not included in the list of exhibits at trial. From the cross-examination of the witnesses, it is apparent that at least some of the statements were used during cross-examination. It is clear from the record that the State produced the statements of these witnesses after direct testimony of each witness.

It is the duty of the Appellant to prepare an adequate record for appellate review. Tenn. R. App. P. 24(b); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983); State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). When no evidence is preserved in the record for review, we are precluded from considering the issue. Roberts, 755 S.W.2d at 836.

In her brief, Defendant lists various inconsistencies in the witness statements of Michael Key, Danetta Marshall, and Chad Robinson as to the time period that certain events occurred. There are no citations to the record, which is understandable as, stated above, the statements of these witnesses were not included in the record. Defendant argues in her brief that "[i]n their totality, these suppressed statements contained material inconsistencies which tended to rebut the

State's theory that the defendant remained at the scene of the shooting for an extended period of time before seeking help."

Our examination of the record reveals that the cross-examination of Danetta Marshall was remarkably brief. Defense counsel brought out on cross-examination that the witness had signed a statement saying that at approximately 3:45 p.m., one of the neighbor children had come into her living room stating that "someone had been shot and to come quick." Michael Key was not cross-examined at all by defense counsel. While Adrian Key was cross-examined, defense counsel did not examine the witness about anything occurring at a particular time. Aron Key was not cross-examined by defense counsel. Chad Robinson was cross-examined by defense counsel, using a portion of his written statement pertaining to whether or not he had spoken with his father prior to returning home from a trip to the store.

It is clear from the record that the Defendant requested to be given access to all witness statements prior to trial, and that the State did not provide these statements to Defendant until after each witness had testified on direct examination. However, there is nothing in the record to indicate that the witness statements of Danetta Marshall, Aron Key, Adrian Key, Michael Key, and Chad Robinson met all the requirements in order to be classified as Brady material.

The statements, even if exculpatory, were provided during trial, and therefore, under Smith, slip op. at 13, Ewing, slip op. at 7-9, and Inman, slip op. at 10, unless the delay itself causes prejudice, Brady does not apply. Defendant has shown no prejudice and therefore Brady does not apply for this reason also.

## II. Sworn Statement of Natalie Romine to Larry Shavers

The Defendant refers to numerous examples of exculpatory evidence contained within the sixty-nine (69) page sworn statement of Natalie Romine which was provided to defense counsel prior to the direct examination testimony of Natalie Romine, but after the trial had already begun. In the argument portion of her brief, Defendant refers to specific examples of purported exculpatory evidence contained in the sixty-nine (69) page statement by a general reference to the recitation of facts contained in the "statement of facts" portion of her brief. In many instances, references to the record of this information is either non-existent or inadequate. For example, some references to the record are to the statements of counsel during the hearing of the motion for new trial. It is well-settled that statements of counsel are not evidence. See Trotter v. State, 508 S.W.2d 808, 809 (Tenn. Crim. App. 1974). We will address the specific examples of purported exculpatory evidence as best we are able to in light of these deficiencies in Defendant's brief.

(1)     Defendant asserts that certain portions of the statement of Natalie Romine are exculpatory because they contradict testimony of Michael Romine, Richard Romine, and the victim's mother, Ruth Hall. The specific contradictions between the statement of Natalie Romine and testimony at trial of Michael Romine and Richard Romine are not delineated in the brief. Natalie Romine, in her statement, told that the Defendant had talked disparagingly about her deceased husband as being "one mean SOB" and "the meanest man that ever walked on the face of this earth." Defendant contends that "other witnesses," specifically Mrs. Ruth Hall, the victim's mother, had testified at trial that it was their observation that a good

relationship existed between the victim and the Defendant.  Defendant now asserts that the portion of Natalie Romine's statement regarding Defendant's statements contrary to what trial witnesses later testified to is exculpatory evidence.

Defendant does not explain how a statement can be recognized by the prosecution prior to trial as exculpatory evidence based upon the testimony of other witnesses during the trial.  However, even if the prosecutor could have been clairvoyant enough to know that a statement of one witness might contradict with other witnesses' trial testimony, we do not believe that this particular instance cited by the Defendant meets the "materiality test" of Kyles, 514 U.S. at 434.

(2)     Defendant asserts in her brief that the statement of Natalie Romine "that Michael Romine was trying to frame the Defendant," is exculpatory and she refers to page 40 of the Natalie Romine statement.  That portion of Ms. Romine's statement, referring to this matter, includes the following, "I didn't really know at this point if Mike [Romine] was trying to frame [Defendant] or if [Defendant] was trying to frame Mike [Romine].  I knew that both of them had a hand in play, but I didn't know how big of a part they were playing."

Natalie Romine testified during the trial to essentially the same information contained in this portion of the statement.  Therefore, since this was presented to the jury, we fail to see that this meets the "materiality test" of Kyles, 514 U.S. at 434.

(3)     The Defendant argues that exculpatory evidence included a portion of Natalie Romine's statement which describes that Michael Romine received an indication from a police investigator that he would get custody of the Defendant's

children and property if he could come up with sufficient evidence to implicate Defendant in the death of the victim. Defendant does not cite the specific portion of Natalie Romine's statement where this can be found. However, in our review of Ms. Romine's statement, we have found this part of her statement. We also note that Ms. Romine testified to the same information during the trial. Therefore, since this information was provided to the jury during trial, we do not see that it meets the "materiality test" of Kyles, 514 U.S. at 434.

(4) In her statement, Natalie Romine told that the Defendant admitted to Ms. Romine that she (Defendant) had attempted to poison the victim. Defendant contends this was exculpatory evidence because it contradicts the trial testimony of the forensic pathologist that there was no evidence of poison in the victim's body. Again, there are no specific citations to the record in Defendant's brief.

However, we have reviewed the testimony of the forensic pathologist, Dr. Harlan. As stated elsewhere in this opinion, Dr. Harlan testified that there was no laboratory test for cyanide poison. However, Dr. Harlan added that if cyanide had been present, he would have detected it. In any event, Ms. Romine testified at trial concerning the Defendant's statement to her that she had tried to poison the victim. Therefore, any benefit of the information in the statement was revealed to the jury, and therefore, it does not meet the "materiality test" for exculpatory evidence.

(5) Defendant asserts that the following portion of Natalie Romine's statement is exculpatory: "It was nothing that she [Defendant] said directly, she just led me to believe that Richard [Romine] had been living with [victim] and that they had not been getting along, they had been fighting every single day and she didn't

-23-

know what happened." Defendant asserts that this is exculpatory because it is inconsistent with trial testimony of "all other witnesses," including Richard Romine, who testified that there were only a few minor instances of problems with the victim and that he did not hate the victim. However, there are no citations to specific portions of the record containing the testimony of all these other witnesses which is purportedly contrary to that portion of Natalie Romine's statement. This does not meet the "materiality test" to be exculpatory evidence.

(6) Defendant contends that the following portion of the Natalie Romine statement is exculpatory: "Because one of the very first things that [Defendant] told me was to thank God that it happened when it did because if it would've any later she wouldn't have had any insurance." She claims this is exculpatory because it is in direct contradiction to the trial testimony of Richard Romine that the victim's employer had recently renewed the insurance.

Natalie Romine testified to this specific information during the trial. Therefore, the jury received the benefit of this information. We do not feel that this meets the "materiality test" of exculpatory information.

(7) In her next reference to exculpatory material, the Defendant asserts that on page 4 of Natalie Romine's statement, Romine says that Defendant told her she would be getting $250,000.00 in insurance proceeds when the testimony at trial was that she received $84,692.38 in insurance proceeds. However, contrary to Defendant's assertions in her brief, the statement of Natalie Romine at page 4 states as follows:

-24-

[Defendant] told me that she [Defendant] knew that she was gonna get almost exactly $250,000 dollars is what she had to gain from Olen's death and that with some insurances combined, she believed that she was gonna receive double indemnity on one of them. She had some stocks and bonds through a couple of different places. She had an antique coin collection, um, his truck, the house, um, several other little things.

We do not see a contradiction between the testimony at trial and the cited portion of Natalie Romine's statement. Therefore, this is not exculpatory.

(8) Defendant asserts that the statement of Natalie Romine contains information that the victim had been unfaithful to the Defendant and that the Defendant and victim were experiencing problems with their sexual relationship. There is no citation to a specific portion of the statement containing this information. She argues that this information is exculpatory because even though they suggest a motive for Defendant to be involved in the killing of the victim, they were "inconsistent" with testimony presented at trial. Defendant does not cite to testimony in the record that is inconsistent and does not even mention the names of witnesses who gave inconsistent testimony to this particular portion of Ms. Romine's statement. Defendant has failed to show that this is exculpatory evidence.

(9) At page 5 of the statement of Natalie Romine, she related that Defendant told her that Richard Romine became angry approximately a year prior to the statement being given and said "I'm gonna kill [victim] and when I do, I'm gonna blame you [Defendant]." Defendant asserts that this is exculpatory information contained in the statement of Natalie Romine.

However, in Defendant's handwritten supplement to her statement to police given on August 1, 1995, the Defendant included the following: "[A]nother time, Richard told my daughter that he would kill Olen by shooting him. I asked him how he would get away with it. He told me that he would blame it on me saying that I had him do it." There is no indication that the Defendant's supplement to her statement to the police was not provided to her well before trial. The information was not undisclosed to Defendant; indeed, she had provided the information herself to the police. Therefore, this does not meet the requirement that the State must have withheld the evidence.

(10)    Defendant argues as exculpatory evidence the portion of Natalie Romine's statement which included a conversation with Defendant wherein Defendant told Natalie Romine that the victim deserved to die. She urges this is so because it is inconsistent with all trial testimony which indicated that the Defendant and the victim had a good relationship. Again, there is no citation to the record of inconsistent testimony. Even if proper citations were made, we fail to see how this meets the materiality test for exculpatory evidence.

(11)    On page 11 of Ms. Romine's statement, she tells of a statement made by the <u>Defendant</u> to another person at the funeral home visitation that Richard Romine had killed the victim because "Richard's been smoking a lot of pot . . . that's why he did it because he's been smoking a lot of pot." Defendant contends that this is exculpatory information because it suggests a basis for Richard Romine's actions in shooting the victim which did not involve the Defendant.

Natalie Romine testified to this precise information during the trial. The jury therefore received the benefit and was able to give it any weight it chose. It, therefore, does not meet the "materiality test" for exculpatory evidence.

(12) The statement of Natalie Romine contains a recitation of how Ms. Romine found the purported "contract" between Richard Romine and Defendant for Richard Romine to kill the victim. Defendant asserts that this information is exculpatory because the statement mentions that the document consists of two (2) pages while the trial testimony of Natalie Romine is that it was one (1) page, and that the statement says the document had some burned edges, contrary to other testimony at trial. Again, there is absolutely no citation to the record in this case where this purported contradictory evidence is contained in the record. We note, however, that the trial testimony of Natalie Romine is that the pages of the "contract" were not on both sides, but were two (2) separate pieces of paper. Even if some portion of the statement can be deemed to be contradictory to the testimony of Ms. Romine at trial, it does not meet the "materiality test" for exculpatory evidence.

(13) Natalie Romine's statement also provided that a portion of the "contract" contained information that Richard Romine would drive to the store and call 911. She claims this is exculpatory because it was "not mentioned by Richard Romine" nor was it included in the document itself. Again, there are no citations to the record which show this contradiction. Defendant points out that included in Natalie Romine's statement is information that she found a cardboard "bong," used for smoking marijuana, in the same room where she had found the "contract." Defendant asserts that this is exculpatory because it supports another portion of Ms. Romine's statement that "Richard Romine was possibly motivated to kill Olen Hall

as a result of his drug usage." An investigator testified at trial that drug paraphernalia was found in a shoe box in a bedroom at Richard Romine's home. This information does not meet the "materiality test" for exculpatory evidence.

(14)    Defendant next asserts that on pages 19 and 20 of Ms. Romine's statement, there is contained the exculpatory evidence that Ms. Romine had informed Michael Romine "that he needed to go to the police with the evidence that the Defendant was involved in the death of her husband." Defendant asserts that this is inconsistent with Ms. Romine's trial testimony "that she did not know enough about the criminal justice system to know to whom information about a crime should be given." Again, there is no specific citation to the record. In any event, this does not meet the "materiality test" of <u>Kyles</u>, 514 U.S. at 434.

(15)    In the next instance of purported exculpatory evidence, Defendant asserts, in essence, that certain information <u>not</u> <u>contained</u> in Ms. Romine's statement makes the statement exculpatory. Specifically, Defendant argues that information in the testimony of Ms. Romine at trial, that one of Defendant's trial attorneys advised her to destroy the "contract," is not contained in her statement. We do not agree with the Defendant's argument that this particular <u>exclusion</u> of information in the statement made it exculpatory evidence.

(16)    In her brief, Defendant states,

On page 40, Ms. Romine indicated that at a certain period of time, *she was convinced the defendant had no role in the death of her husband*. Certainly, such evidence would be crucial not only for impeachment purposes, but also as exculpatory evidence as the basis for this belief might have formed a basis for proving the Defendant's innocence if known prior to trial. (Emphasis added).

We have examined page 40 of Ms. Romine's statement. The only portion of it that pertains to this issue is as follows:

> Q. O.K., so, uh, after uh, [Defendant] got back in North Carolina, uh, did she have a time to more or less work on you to convince you that she had no part in this?
>
> A. Yes.
>
> Q. Did she do a pretty good job of that?
>
> A. Yes, she did.
>
> Q. Did she about have you convinced that she didn't have anything do to with it?
>
> A. She had convinced me that Mike was framing her.
>
> Q. O.K.
>
> A. She didn't have me convinced that she didn't have a part in play, she downplayed her part and said that she didn't know exactly what was going to happen, but Mike let her know that something was going to happen and then [victim] was killed and she said that she had no problem with that. She didn't care that [victim] was dead because [victim] needed to die, [victim] deserved to die.

Ms. Romine testified during the trial to basically the same information. Therefore, the jury had the benefit of it, and we do not see how this portion of the statement meets the "materiality test" for exculpatory evidence.

(17) At page 42 of the statement, Natalie Romine relayed, in describing the events surrounding the Defendant first talking to one of her trial attorneys to retain him, that "Jeff Bradford [a police investigator] grabbed his crotch and he said that he had a real hard-on for the case and he wasn't going to rest until [Defendant] was behind bars." Defendant contends that this is exculpatory evidence because it "suggests bias on the part of the law enforcement officials conducting the investigation." She points out that this is attributed to the same law enforcement

officer who supposedly told Michael Romine that he could obtain custody of the Defendant's children and all of her money if he supplied enough information to implicate the Defendant in the death of her husband.

Again, all of this information was brought out during the trial in the testimony of Natalie Romine. It does not meet the "materiality test" for exculpatory evidence.

(18) Defendant asserts that a portion of the statement of Natalie Romine is exculpatory because it contradicts Romine's testimony at trial that one of Defendant's lawyers instructed Defendant to destroy the "contract." At trial, Ms. Romine testified during cross-examination in part as follows:

> Q. Let me stop you right there. I don't mean to interrupt you, but that's one thing I want to know.
>
> You're telling this jury that [Defendant] told you that [defense counsel] told her to destroy a piece of evidence?
>
> A. [Defendant] was on the cordless phone talking to it just like this. On our cordless phone, you can hear in another room.
>
> Q. Are you telling this jury under oath that you heard [defense counsel] tell her to destroy a piece of evidence?
>
> A. That I personally heard that.

In her statement, Ms. Romine related that Defendant said her lawyer had said not to do anything with the "contract," that he was going to send his associate to retrieve the document. She also indicated that she heard the defense lawyer state that his associate "will be in Raleigh [North Carolina] tomorrow first thing on a plane."

Natalie Romine also testified at the trial that the lawyer's associate would be in Raleigh, North Carolina to retrieve the contract. Any contradictions in the statement and/or the testimony were put before the jury. Even if a portion of the statement has an irreconcilable contradiction in testimony at trial, this would not normally be known to the prosecution until the witness testified at trial. Therefore, if it were exculpatory, that fact could not be known until the trial. In any event, we do not feel that this meets the "materiality test" for exculpatory evidence.

We have examined the Defendant's claims of withheld exculpatory evidence in Natalie Romine's statement cumulatively. It is our conclusion that there was not a violation of Brady by the prosecution in the particular instances relied upon by the Defendant in the typewritten statement of Natalie Romine. In addition, we find that the delay in providing the sixty-nine (69) page statement of Natalie Romine, even if the material were exculpatory, did not itself cause prejudice. Smith, slip op. at 13; Ewing, slip op. at 7-8; Inman, slip op. at 10.

### III. TBI REPORT OF SPECIAL AGENT DONNA PENCE

Concerning this issue of alleged exculpatory material, Defendant refers to a portion of the "statement of the facts" in her brief to delineate examples of exculpatory material contained in a typewritten report of Special Agent Pence. This report was not disclosed to Defendant until after trial, having been placed under seal by the trial court during the trial, and unsealed after the verdict upon motion of Defendant. While Defendant does specify various purported examples of exculpatory information and inconsistencies between the TBI report and trial testimony or other portions of witness statements, there are absolutely no references

to the record specifying at what page of a statement or trial testimony the inconsistencies with the TBI statement occur. However, we have reviewed the examples of alleged exculpatory information and find that for the most part, they are covered in Defendant's allegations of exculpatory material contained in the sixty-nine (69) page sworn statement given by Natalie Romine to the private investigator. The ones that are not specifically contained in Natalie Romine's statement to the investigator are not Brady material because they are not "material."

However, we do find that it was error for the State to not produce at least a portion of Agent Pence's report to Defendant after Natalie Romine testified as it is Jencks material. Included within the definition of a "statement" of a witness in Rule 26.2(g) of the Tennessee Rules of Criminal Procedure is the following:

> (1) A written statement made by the witness that is signed or otherwise adopted or approved by the witness . . . .

The second paragraph of the first page of the TBI report by Agent Pence states as follows:

> (Agent's Note: The first portion of the statement was written by Mrs. [Natalie] Romine prior to our arrival and turned over to this agent after the oral interview).

The remaining portion of the first page of the report, the second and third typewritten pages of the report and the first paragraph of the fourth page of the report are indicated to be a verbatim transcript of the written statement of Natalie Romine provided to the TBI agent. In fact, at the end of this quotation from the written statement is typed "(End of written statement)."

There is no doubt that this portion of Agent Pence's report contains a written statement of Natalie Romine which should have been provided to defense counsel no later than after the direct examination of Natalie Romine. The prosecution cannot incorporate a witness' statement, as defined by Rule 26.2(g), into a law enforcement report and thereby avoid the requirement to provide the statement to defense counsel as provided in Rule 26.2.

It appears from the record that there was some amount of confusion during the jury out hearing concerning disclosure of this report by TBI Agent Pence. At one point, the district attorney announced as follows:

Mr. McCown: Let me add something to them. That is exactly right. It [the statement given to Pence by Natalie Romine] is a 13 ½ page part of a journal that Natalie Romine wrote out in her own handwriting. I have got it. It is Jencks material at the time, and if and when she [Natalie Romine] testifies, I will give it to them.

Subsequently in the jury out hearing, it appears that the following colloquy occurred between one of the defense counsel, the assistant district attorney participating in the trial, and the court:

Mr. Fraley [defense counsel]: My question is: After she [Natalie Romine] testifies, can I ask for that [Pence] report that she gave a statement on as Jencks material at that - -

Mr. Barnard [assistant district attorney]: The State objects.

The Court: I have already ruled that apparently she did not adopt that as her own statement, that particular statement. There may be, according to the State, portions - - or they may be in possession of other information that she has adopted that they say they are only going to supply to you after she [Natalie Romine] testifies.

| | |
|---|---|
| Mr. Fraley: | If I had the report, it would help me in my cross-examination. "Did you tell her this? Did you tell her this?" |
| The Court: | You will be given an opportunity to review any <u>Jencks</u> material that is provided to you. But there has to be some rule that you are entitled to it. You are correct. It would be helpful to you to have that. But I do not know of any rule that provides they must give it to you based upon what I have heard today.<br><br>Are we ready to proceed? |
| Mr. Barnard: | Yes. |

The jury was called back into the court and the trial proceeded.

We have reviewed this statement by Natalie Romine, and while there are some inconsistencies, they appear to be minor and/or were brought out within the sixty-nine (69) page sworn statement of Natalie Romine to the investigator or during her trial testimony. The error which resulted by the failure of compliance with Rule 26.2 of the Tennessee Rules of Criminal Procedure is harmless beyond a reasonable doubt. Tenn. R. App. P. 36(b); Tenn. R. App. P. 52(a);

PERJURED TESTIMONY

Defendant argues that the trial court erred in failing to grant a new trial for the Defendant when it was demonstrated that Natalie Romine committed perjury during her testimony at trial. Specifically, Defendant points to the fact that when questioned as to her history of arrest, she claimed to have been arrested on only two (2) occasions, one of which was a "mistake". However, following the Defendant's conviction, evidence was discovered that Ms. Romine was not arrested "by mistake"

for theft of a car battery and had also been convicted of numerous other offenses including second degree trespass and driving offenses. Furthermore, when questioned as to her history of experience with law enforcement, Natalie Romine failed to reveal her husband's extensive arrest record. The State counters that even if the Defendant could have impeached this witness with the newly discovered evidence, the outcome of the trial would have been the same.

The trial court has the sound discretion in determining whether to grant a new trial on the basis of newly discovered evidence. State v. Goswick, 656 S.W.2d 355, 358 (Tenn. 1983) (citations omitted). In order to acquire a new trial, the defendant must demonstrate: (1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence; and (3) that the evidence will likely change the result of the trial. Goswick, 656 S.W.2d at 358-60. Upon consideration of the newly discovered evidence in this case, the trial court refused to grant a new trial. Newly discovered impeachment evidence, as a general rule, will not constitute grounds for a new trial. State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993). However, if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal, a new trial may be ordered. Id. (citations omitted).

While the trial court found that Defendant exercised reasonable diligence in the search for evidence, it did not find that the impeachment evidence of Natalie Romine's prior convictions was so material as to change the result of the Defendant's trial. While this evidence may have discredited the testimony of Natalie Romine, she was not the only witness testifying against the Defendant and her involvement in the murder of the victim. We agree with the trial court that, even if the

-35-

jury had heard this newly discovered evidence, a different result would not have followed.

### SUFFICIENCY OF THE EVIDENCE

Defendant argues that due to the State's Brady violations and the newly discovered evidence of Natalie Romine's perjury which constituted grounds for impeachment, that the remaining testimony of the two accomplices, Michael and Richard Romine, is insufficient to sustain the Defendant's conviction. We have held contrary to Defendant's assertions on these issues. Also, as the trial court stated, "Natalie Romine was not a lynch pin witness. The State presented other witnesses, the most damning of which were the Defendant's son and brother who each related the Defendant's guilt." There was more than sufficient evidence of Defendant's guilt. This issue is without merit.

We affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
JOHN H. PEAY, Judge

_____
L.T. LAFFERTY, Special Judge